N4BsILOs

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          21 CR 579 (PGG)

5    GEORGE ILOULIAN,

6              Defendant.

7    ------------------------------x

8                                     New York, N.Y.
                                      April 11, 2023
9                                     3:30 p.m.

10
     Before:
11
                    HON. PAUL G. GARDEPHE,
12
                                      District Judge
13

14                       APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     BY:  KAYLAN LASKY
17        Assistant United States Attorney

18   HADASSA R. WAXMAN
          Attorney for Defendant
19
     ALSO PRESENT:
20   HANNAH SILVERMAN
     PORTIA PROCTOR
21

22

23

24

25
```

N4BsILOs

1          (Case called)

2          THE DEPUTY CLERK:  Counsel for the government, please

3     state your appearance.

4          MS. LASKY:  Good afternoon, your Honor.

5          Kaylan Lasky for the government.

6          THE COURT:  Counsel for the defendant, please state

7     your appearance.

8          MS. WAXMAN:  Good afternoon, your Honor.

9          Hadassa Waxman for Mr. Iloulian.  Joining me at

10    counsel table are two associates from my law firm, Hannah

11    Silverman and Portia Proctor.

12         THE COURT:  All right.  This matter is on my calendar

13    for purposes of sentencing.

14         In preparation for sentencing I have read the

15    presentence report, which is dated January 24, 2023.  I have

16    read defense submissions dated February 2, 2023, including

17    letters from the defendants' friends and family.  I also read

18    the government's submission dated February 10, 2023.  I have

19    read letters from the defense and the government dated

20    March 24, 2023.  Also, the government letter dated April 7,

21    2023, and a letter from defense counsel dated April 10, 2023.

22         I have also read letters from Hamid Lahijani,

23    H-a-m-i-d L-a-h-i-j-a-n-i.  His letter is dated March 10, 2023,

24    and April 7, 2023.  Mr. Lahijani is the relater in a key False

25    Claims Act case against the defendant pending before me, *United*

N4BsILOs

*States, ex rel. Lahijani v. Delta Uniforms, Inc. and George*

*Iloulian,* 19 CV 3290, and his letters were filed on the civil

case docket.

          Ms. Waxman, have you read the presentence report and

its recommendation and discussed it with Mr. Iloulian?

          MS. WAXMAN:  I have, your Honor.

          THE COURT:  Mr. Iloulian, have you read the

presentence report, representation, and discussed it with

Ms. Waxman?

          THE DEFENDANT:  Yes, your Honor.

          THE COURT:  Ms. Waxman, do you have any objections to

the factual portions of the presentence report?

          MS. WAXMAN:  We do not, your Honor.

          THE COURT:  Does the government have any objections to

the factual portions of the presentence report?

          MS. LASKY:  Your Honor, there is a spot on page 24 of

the recommendation from probation in which it refers to the

incorrect forfeiture number.  It's correctly referenced

elsewhere.

          THE COURT:  Right.

          So on page 24, there is a reference to a forfeiture

number of $789,195.35.  It is my understanding that the parties

agree that the correct forfeiture number is $249,000, is that

correct?

          MS. LASKY:  Yes, your Honor.

N4BsILOs

1          MS. WAXMAN:  Yes, your Honor, it is.

2          THE COURT:  All right.  So that change will be made to

3     the presentence report, page 24.  The forfeiture amount will be

4     corrected from $789,195.35 to $249,000.

5          Other than that change with respect to the

6     typographical error about the forfeiture amount, I hereby adopt

7     the factual statements set forth in the presentence report.

8          Before I continue, let me address the two letters that

9     I referenced from Hamid Lahijani, as I noted, is the relater in

10    a False Claims Act case against the defendant.  In a March 10,

11    2023, letter Lahijani suggests that the defendant has engaged

12    in fraudulent customs duties related activity after the filing

13    of the indictment in this case.  Citing the March 10, 2023

14    Lahijani letter filed as docket number 15 in 19 CV 3290.

15         Mr. Lahijani's allegations relate to his purchase of

16    Delta Uniforms clothing in February and March of 2023.  Delta

17    Uniforms is the defendant's company, and the clothing did

18    not -- the clothing label did not accurately reflect the fabric

19    content.  In his March letter, Lahijani writes that, "it seems

20    highly likely that [the clothing was] imported after the filing

21    of the indictment in this case on September 20, 2021, and

22    probably after the time that Mr. Iloulian pled guilty on

23    July 26, 2022."  Citing the March 10, 2023 letter I made

24    reference to earlier at page three.  Mr. Lahijani goes on to

25    assert that, "Mr. Iloulian is likely continuing to engage in at

N4BsILOs

1    least the fabric-type fraud alleged in the case." *Id.*

2          Given these serious allegations, I directed the

3    government and the defense to respond to Mr. Lahijani's letter.

4    Citing the March 11, 2023 order, docket number 54.  The

5    government and the defense filed their responses to my order on

6    March 24, 2023, citing docket numbers 55 and 56.  In its

7    submission, the government states, "The merchandise described

8    by the relater in support of his allegations appears to have

9    been imported before the indictment was returned.  Therefore,

10   contrary to the relater's intention, the relater's information

11   does not indicate that the defendant had continued to engage in

12   the fabric-type fraud." Citing the March 24, 2023, government

13   letter, docket number 55 at page one.

14         The government states that it "investigated the

15   relater's allegations" by "purchasing [the same pants the

16   relater had at one of the stores] to verify the information

17   that the relater described."

18         "Testing the fabric composition of [these] pants,"

19   "obtaining records from the U.S. Customs and Border Protection

20   and Delta's customs broker relating to recent inbound shipments

21   associated with Delta and/or the defendant," and "collecting

22   records relating to [both stores'] business dealings with Delta

23   and/or the defendant." *Id.* at pages one through two.

24         The government states that, though, "The U.S. Customs

25   and Border Protection laboratory also found that the [pants the

government bought] were 100 percent polyester." This finding does not indicate post-indictment fraud by Mr. Iloulian because, based on the customs and store records the government reviewed, the pants the relater purchased from both stores "are from a shipment that was exported from Pakistan on or about September 10, 2021" and the shirt relater purchased "came from an even earlier shipment." *Id.* at page two at note one.

The indictment in this case was filed on September 20, 2021. Citing docket number one. Therefore, the government concludes that the charges were filed "after the export date of these items [so] the relater's information does not support the relater's allegation that the defendant has continued to engage in the fabric-type fraud since being charged." *Id.* at page two.

The defense agrees that the clothing cited by Mr. Lahijani was either imported on September 10, 2021, or before that date. Citing the March 24, 2023 defense letter, docket number 56 at page one. As a result, I conclude that there is no evidence that the defendant has engaged in the same type of fabric-based customs fraud since the indictment was filed in this case.

Turning to the sentencing guidelines. Although I'm not required to impose sentence in accordance with the sentencing guidelines, I am required to consider what the guidelines recommend.

Here, Mr. Iloulian pled guilty to conspiracy to commit

N4BsILOs

1    wire fraud.  The base offense level for this offense is seven

2    because the loss amount was more than $150,000, but less than

3    $250,000.  His offense level is increased by ten levels.

4    Mr. Iloulian's offense level was reduced by three levels for

5    acceptance of responsibility, resulting in a total offense

6    level of 14.  Mr. Iloulian has no prior convictions, he

7    therefore falls within criminal history category I.

8            Before proceeding further, let me address another

9    letter I received from the government on or about April 7.

10   In that letter the government states that Mr. Lahijani had

11   notified the government about a July 11, 1996, arrest of a

12   person named George Iloulian in the Southern District of

13   California.  According to the government's letter, the

14   complaint was dismissed with prejudice on October 16, 1996.

15   The government was not able to determine whether the George

16   Iloulian named in the complaint is the same person as the

17   defendant.  In any event, the charge did not result in a sort

18   of conviction, and an arrest standing alone is proof of

19   nothing.  Accordingly, I will give no weight to this report in

20   determining the defendant's sentencing.

21           Returning to the guidelines, offense level 14 and

22   criminal history category I results in a guidelines range of

23   15 to 21 months' imprisonment.

24           Ms. Waxman, does the defendant have any objection to

25   the accuracy of the guidelines calculations as I have reported

N4BsILOs

1    them?

2            MS. WAXMAN:  No, your Honor.

3            THE COURT:  Does the government have any objection to

4    the accuracy of the guidelines calculations as I have reported

5    them?

6            MS. LASKY:  No, your Honor.

7            THE COURT:  Based on my independent evaluation of the

8    sentencing guidelines, I find that the total offense level is

9    14, the criminal history category is I, and the recommended

10   sentence under the guidelines is a sentence between 15 and

11   21 months' imprisonment.

12           I'll hear from you, Ms. Waxman, as to an appropriate

13   sentence.

14           MS. WAXMAN:  Thank you, your Honor.

15           First, I would like to thank the government for its

16   thoughtful approach and consideration on this matter.  With

17   respect to sentencing, your Honor, we respectfully request that

18   the court follow probation's recommendation and impose a

19   sentence of time served to be followed by a period of

20   supervised release.

21           In making this request, your Honor, we are mindful of

22   the seriousness of the crime.  Indeed, I expect when

23   Mr. Iloulian addresses the court shortly, he will express his

24   deep regret and apologize to the court for his errors and for

25   his previous misconduct.  As your Honor might recall, within

minutes of Mr. Iloulian's arrest, he made a full post-arrest

statement in which he admitted his conduct and he also

expressed deep regret.

Any delay in scheduling his guilty plea -- I

understand this case has been on the court's docket for many,

many months -- the delay was not on Mr. Iloulian at all.  It

was the result of the lawyers who were reviewing the discovery

to determine what the correct loss amount was.  And during

those negotiations, Mr. Iloulian continued to press us to

schedule his plea because he wanted to accept responsibility

before your Honor, move on with his life, and make amends.

With respect to our request that your Honor impose a

sentence of time served, we set forth those reasons in our

sentencing submission that we know your Honor has carefully

reviewed and we won't repeat those.  But if I may just take a

few moments to elaborate on some of those reasons here.

First, in making its recommendation, the probation

department recognized Mr. Iloulian's rather extraordinary life

beginning from the time when he was just 17, when he escaped

antisemitism in Iran, coming to the U.S. literally without a

penny, without the ability to speak English, and without an

education.

Probation recognized that Mr. Iloulian has lived a

productive and meaningful life in the United States.  He built

a family, a very loving, close family.  He built a business.

N4BsILOs

1  He became the father of three children, one of whom is his

2  stepson who Mr. Iloulian has taken on as his own.  He's now the

3  proud grandfather of two young boys.

4       Mr. Iloulian also sponsored members of his family who

5  remained in Iran facing religious persecution and helped bring

6  them to the United States, where they now live safely as a

7  result of Mr. Iloulian's efforts.

8       Probation further recognized in making its

9  recommendation that Mr. Iloulian is committed to his elderly

10  and ailing mother, that he helps support her financially, and

11  that he helps support his children financially.

12       Probation further recognized that Mr. Iloulian is a

13  64-year-old man.  He is in failing health.  That this is his

14  first interaction with law enforcement, that he has done good

15  work for his community, that he has been completely compliant

16  during his pretrial release, that he is a man of faith, that he

17  raised children of faith, and is now helping to raise his

18  grandchildren within the Jewish traditions.

19       As probation concluded, the history and

20  characteristics of Mr. Iloulian militate here in favor of

21  leniency, and we would again respectfully request that the

22  court adopt that conclusion.  I'll also note, of course, that

23  the government here has recommended that your Honor impose a

24  sentence below the guidelines.

25       Second, with respect to specific deterrence, this case

has literally destroyed Mr. Iloulian's family and his business.

Has brought shame to himself, his wife, and his three children.

Having experienced the pain and trauma of monumental negative

life changes resulting from his misconduct, I would submit,

your Honor, that there is nearly zero chance that Mr. Iloulian

will ever recidivate.

Just to give your Honor some background, the relater

is a close cousin of the Iloulians, who Mr. Iloulian brought

into the business as a full partner when the relater was down

on his luck and was desperate for some income.  The relater

fully participated in the conduct charged, and since

Mr. Iloulian's arrest, based on the statements of the relater,

what was once a very close-knit, large extended family has been

in complete turmoil, which has caused not only Mr. Iloulian and

his wife great pain, but also the rest of the family.

In addition, he lost all but lost his business, though

Mr. Iloulian is doing whatever he can to restore his business

so he can fulfill his obligation to his family, and also his

obligations to the government that would be forthcoming.  You

know, a man of 64 with limited mobility and energy, due to

serious health issues, that's not an easy feat.

Your Honor, I would make the obvious point that an

incarceratory sentence will make it really impossible for

Mr. Iloulian to rebuild his business and earn an income, which

will of course, in part, going to paying his restitution in

N4BsILOs

1    this case.

2         With respect to general deterrence, Mr. Iloulian's

3    arrest has achieved just that.  The community in which he works

4    in the Garment District is small, and Mr. Iloulian has been a

5    prominent member of that community for literally decades.  His

6    colleagues, his business partners, his competitors have seen

7    the impact of this case on Mr. Iloulian's family and business,

8    and understand that were they to engage in the same misconduct,

9    their livelihoods would also be at grave risk.

10        Just a few words on Mr. Iloulian's health, which we

11   noted in our papers.  He is not a well man.  As your Honor is

12   aware, he has hypertension, high cholesterol, suffers from

13   shortness of breath, fatigue.  He takes a slew of medications,

14   he has had heart surgery.  He also has a pinched nerve for

15   which he receives monthly treatments.  And prison, I

16   respectfully submit, your Honor, would be much harder for

17   Mr. Iloulian than the average man.

18        I wanted to note also that Mr. Iloulian's family

19   members, including his wife, his elderly mother, his sisters,

20   his children, his grandchildren, wanted to come today to

21   support him, but he insisted that they not come because he

22   didn't want to burden them and upset them more than he already

23   has.  But they are all here in spirit and wanted me to

24   communicate to your Honor that they are eager and anxious to

25   get their father, grandfather, husband home so that they can

1    begin to repair their broken family.

2            Your Honor, for all of these reasons, we respectfully

3    request that the court follow probation's recommendation and

4    impose a sentence of time served.  With that, I'll rest on our

5    memo and obviously will be happy to answer any of the court's

6    questions.

7            THE COURT:  All right.  Mr. Iloulian, is there

8    anything you wish to say before the court imposes sentence?

9            You can remain seated, sir, and please pull the

10   microphone close to you so the court reporter can take down

11   what it is you say.

12           MS. WAXMAN:  Sorry, we have to...

13           THE DEFENDANT:  Your Honor, thank you for your time

14   overseeing this case and considering the memo and letters

15   submitted on my behalf.  I sincerely accept full and complete

16   responsibility for my action.  There is no excuse for my

17   conduct.  I am sorry to the court, the government, and most of

18   all my wife, my children, and my mother.  I recognize the

19   damage I have caused and the pain I have put to those closest

20   to me through.

21           I am ashamed and embarrassed that I stand before you

22   today.  I know I can never fully right each wrong that lead me

23   here.  Nonetheless, I have plans for the future for myself and

24   my family, and to raise the money to pay back every cents I owe

25   to the government.

N4BsILOs

1      Your Honor, I'm 64 years old and I have several

2   medical conditions.  From today on, my future is in God's

3   hands.  I can take care of my family and what I owe to the

4   government.  I respect whatever decision your Honor makes, but

5   I sincerely hope that I can spend those years repairing the

6   harm that I have caused outside of the prison.

7      Thank you, again, for your time and consideration.

8      THE COURT:  All right.  I'll hear from the government.

9      MS. LASKY:  Your Honor, the government has set forth

10  its position in the letters that are before the court.  I would

11  rest on those submissions.  Of course, if the court has any

12  questions, happy to answer those.

13      THE COURT:  All right.  In deciding upon an

14  appropriate sentence, I have considered all the factors listed

15  in Title 18, United States Code, Section 3553(a), including the

16  nature and circumstances of Mr. Iloulian's offense, his

17  personal history and characteristics, the need for the sentence

18  imposed to reflect the seriousness of the offense, the need to

19  promote respect for the law, to provide just punishment, and to

20  afford adequate deterrence to criminal conduct.

21      Beginning with the nature and circumstances of the

22  offense.  Mr. Iloulian owned and operated a business through

23  which he sold medical and chef uniforms.  He bought the

24  uniforms from Asian manufacturers and sold them in the United

25  States.  Between 2010 and 2020, he submitted false invoices to

N4BsILOs

the U.S. Customs and Border Protection, which I allowed him to
understate the value of the goods he imported, and thus to
avoid paying customs duties.  He successfully avoided paying
customs duties amounting to $249,000.

Mr. Iloulian avoided the customs duties through the
use of two separate fraudulent schemes.  The first involved the
use of double invoices.  The defendant had actual invoices
which reflected the actual price that his company had paid for
the clothing purchased from overseas manufacturers, but he also
arranged for the preparation of phony invoices that were to be
given to U.S. Customs.

Those phony invoices reflected false and lower prices.
The defendant submitted the phony customs invoice to a customs
broker who in turn submitted the phony invoices to U.S.
Customs.  The defendant's use of the phony invoices allowed him
to evade the customs duties.  The defendant either asked the
overseas manufacturer to prepare two sets of invoices or he
simply fabricated the phony invoices himself.

The defendant's other fraudulent scheme involved lying
about the nature of the fabric he was importing.  The defendant
would direct the overseas manufacturer to misstate in the
invoice the fabric used in the clothing that the defendant was
purchasing.  The invoice would falsely state that the clothing
was made from a fabric that carried a lower duty rate.  For
example, the phony invoice would say that the clothing was made

N4BsILOs

1    from cotton when, in fact, it was made from polyester.  The

2    phony invoice or false invoice would be submitted to U.S.

3    Customs and would result in a lower duty than would have

4    otherwise been the case if the true fabric had been reflected

5    in the invoice.

6         The parties agree that the defendant caused the

7    government a loss of $249,000.  As to the defendant's personal

8    history and characteristics, he is 64.  He was born in Tehran.

9    His father was in the fabric business there.  His father died

10   of cancer when the defendant was 16, and the defendant had to

11   work in order to support his family.

12        Work was extremely difficult because of pervasive

13   antisemitism.  In 1979 at the age of 21, the defendant

14   immigrated to the United States.  He received political asylum

15   because of the persecution suffered by Jews in Iran.  As we

16   have heard, the defendants succeeded in bringing to the United

17   States other members of his family.

18        Mr. Iloulian has been married twice.  The first

19   marriage ended in divorce.  The second marriage has continued

20   for more than 22 years and has resulted in two children, now 21

21   and 19.  The defendant also became the stepfather to his wife's

22   son.  By all accounts, Mr. Iloulian has been an excellent son,

23   father, and husband, and I have read many letters of support

24   from members of his family as well as his friends.

25        As to education, Mr. Iloulian graduated from high

N4BsILOs

school in Tehran.  As to employment, for more than 20 years he

has owned and operated the clothing business which brings us

here today.  As to medical condition, Mr. Iloulian suffered a

heart attack in 2012, and he has had a number of stints

inserted over the years.  He takes blood thinners as well as

medication for high blood pressure and high cholesterol.  There

is no history of substance abuse and Mr. Iloulian has no

criminal record.

As I noted, the guidelines recommend a sentence of

15 to 21 months' imprisonment.  The probation department has

recommended a sentence of time served.  The government seeks a

sentence below the guidelines range.  The defendant seeks a

nonincarceratory sentence.  With all of this in mind, I will

now describe the sentence I intend to impose, and I'll ask the

parties if there is anything further they wish to say.

The aggravating factors here are that the fraud scheme

went on for ten years and involved a substantial amount of

money – $249,000.  This scheme involved careful coordination

with the overseas manufacturers and the preparation of

countless fraudulent documents that were submitted to

U.S. Customs officials.  Schemes of this sort are extremely

difficult to detect as demonstrated by the fact that this

scheme went on for ten years.  They also create unfairness in

the marketplace because a business like the defendant's, that

cheats on customs duties, has a competitive advantage.  This

1    type of conduct encourages others to defraud the government.

2            Accordingly, when conduct of this sort is detected, it

3    must be harshly punished.  General deterrence is an important

4    objective.  As to mitigation, the defendant is 64 and has no

5    criminal record.  He has a heart condition.  Prison will be

6    more difficult for him than for a younger and a healthier man.

7    The defendant lost his father at a young age and then was

8    forced to flee his home land because of religious persecution.

9    He arrived in this country with nothing and became a successful

10   businessman.  He has been a good family man.

11           Weighing the aggravating and mitigating circumstances,

12   I have concluded that a sentence below the guidelines range is

13   appropriate but that a sentence of incarceration is necessary.

14   I intend to impose a sentence of six months' imprisonment.

15           As to supervised release, I intend to impose a term of

16   one year on the following conditions:

17           Mr. Iloulian will not commit another federal, state,

18   or local crime;

19           He will not illegally possess a controlled substance;

20           He will not illegally use a controlled substance.

21           I intend to suspend the mandatory drug-testing

22   condition based on my determination that Mr. Iloulian presents

23   a low risk of future substance abuse.

24           Mr. Iloulian will cooperate in the collection of DNA

25   as directed by the probation officer, and he will make

N4BsILOs

1    restitution as I will describe in a moment.

2            I intend to impose the standard conditions of

3    supervised release set forth in the presentence report along

4    with the following special conditions:

5            Mr. Iloulian will submit his person and any property,

6    residence, vehicle, papers, computer, other electronic

7    communication or data storage device, cloud storage or media

8    and effects to a search by any U.S. Probation Officer where

9    there is a reasonable suspicion that a violation of the

10   conditions of supervised release may be found.  Failure to

11   submit to a search may be grounds for revocation.  Mr. Iloulian

12   will warn any other occupants that the premises may be subject

13   to search pursuant to this condition.  Any search shall be

14   conducted in a reasonable time and in a reasonable manner.

15           Mr. Iloulian will provide the probation officer with

16   access to any requested financial information and he will not

17   incur new credit charges or open additional lines of credit

18   without the approval of the probation officer.

19           Mr. Iloulian will be supervised by the district of his

20   residence.

21           I do not intend to impose a fine because, given

22   Mr. Iloulian's restitution/forfeiture obligations, a fine is

23   not appropriate.

24           I am required to impose a $100 special assessment.

25           As to forfeiture, the parties have executed and I have

1   signed a consent order of forfeiture that requires Mr. Iloulian

2   to forfeit $249,000.  As to restitution, the parties have

3   submitted a proposed consent order of restitution that provides

4   for Mr. Iloulian to make restitution to the United States in

5   the amount of $249,000.

6           Ms. Waxman, is there anything further you wish to say?

7           MS. WAXMAN:  Yes, your Honor.

8           To the extent when Mr. Iloulian is released from

9   incarceration on his supervised release, we would respectfully

10  request that he be permitted to have his passport back.  He's

11  got graves that he would like to visit in Israel and family in

12  Jerusalem.

13          We would also request that he be permitted to travel

14  throughout the United States.  As I mentioned, Mr. Iloulian is

15  desperately trying to rebuild his business.  He's got prospects

16  in Florida, Missouri, Maryland, and other places, and we would

17  request that he be permitted to travel throughout the United

18  States for business purposes.

19          THE COURT:  If you submit a letter seeking the return

20  of his passport at the appropriate time, as well as permission

21  to travel, I will sign the letter.

22          MS. WAXMAN:  Thank you very much.

23          We would also request this Mr. Iloulian be able to

24  self-surrender.

25          THE COURT:  What date do you have in mind?

N4BsILOs

1          MS. WAXMAN:  Your Honor, if I may just consult with my

2     client for one moment.

3          And also to be designated to a facility close to New

4     York to facilitate family visits, and also a location where he

5     would be able to receive the medication and other treatment

6     that he requires.  Thank you.

7          If I may have a moment, your Honor?

8          THE COURT:  Go right ahead.

9          (Counsel confers with defendant)

10         MS. WAXMAN:  Your Honor, if I may have a few more

11    moments to confer with Mr. Iloulian?

12         The issues we're thinking about now that he's on the

13    verge of creating some business opportunities for himself,

14    there is also the Jewish holidays that happen in September, and

15    it would be, I think, a real challenge for him to observe the

16    holidays while incarcerated.

17         If I may just have another few moments, I would

18    appreciate that.

19         THE COURT:  Sure.

20         MS. WAXMAN:  Thank you.

21         (Counsel confers with defendant)

22         Your Honor, if I may respectfully request a period of

23    six months so he can attend to business issues and also be home

24    for the high holidays which occur in September?

25         THE COURT:  What's the government's position?

N4BsILOs

1      MS. LASKY:  No objection, your Honor.

2      THE COURT:  All right.  So today is April 11, so six

3  months would bring us to October 11.  I'll provide for a

4  surrender date of October 11.

5      Anything else, Ms. Waxman?

6      MS. WAXMAN:  No, your Honor.

7      THE COURT:  Mr. Iloulian, anything further you wish to

8  say?

9      THE DEFENDANT:  No, your Honor.  Thank you.

10      THE COURT:  Anything else from the government?

11      MS. LASKY:  Your Honor, the government would move to

12  dismiss the open counts.

13      THE COURT:  That motion is granted.

14      MS. LASKY:  And I apologize, I may have missed this.

15  I know that the court had stated that there was a restitution

16  order that had been submitted by the parties.

17      THE COURT:  I actually haven't finished imposing the

18  sentence yet.

19      MS. LASKY:  I apologize, your Honor.

20      THE COURT:  That's OK.

21      Mr. Iloulian, for the reasons I just stated, it is the

22  judgment of this court that you be sentenced to six months'

23  imprisonment and one year of supervised release.  Your term of

24  supervised release will be subject to the mandatory standard

25  and special conditions just mentioned.

1            As set forth in the consent order of forfeiture, you

2     are ordered to forfeit $249,000 to the government.  As set

3     forth in the consent order of restitution, you are ordered to

4     make restitution in the amount of $249,000 to the U.S. Customs

5     and Border Protection.  You're also ordered to pay a special

6     assessment in the amount of $100.

7            I do recommend to the Bureau of Prisons that

8     Mr. Iloulian be incarcerated as close as possible to the New

9     York Metropolitan area so that he may maintain ties with his

10    family and friends during his period of incarceration.  Of

11    course the facility to which he is designated is one that is

12    capable of providing the medication and treatment necessary for

13    his heart condition.

14            Mr. Iloulian will be permitted to voluntarily

15    surrender.  The surrender date will be October 11 at 2:00 p.m.

16    I expect that Mr. Iloulian will be designated to an

17    institutional that point.  However, if for some reason he has

18    not been designated, he will surrender to the U.S. Marshal.

19    This district by two o'clock on October 11.

20            Mr. Iloulian, were you not to surrender on that a date

21    by that time, you would be committing a separate federal

22    offense for which you could receive a separate and consecutive

23    sentence.

24            I am required to advise you of your appeal rights.

25    You can appeal your conviction if you believe that your guilty

N4BsILOs

plea was unlawful or involuntary or if there was some other

fundamental defect in the proceedings that was not waived by

your guilty plea.  You also have a statutory right to appeal

your sentence under certain circumstances.  With few

exceptions, any notice of appeal must be filed within 14 days

of judgment being entered in your case.  The judgment will

likely be entered tomorrow.

        Ms. Waxman will discuss with you whether or not you

wish to file a notice of appeal.  If you are not able to pay

the cost of an appeal, you may apply for leave to appeal

*in forma pauperis*.  If you request, the Clerk of Court will

prepare and file a notice of appeal on your behalf.

        Ms. Lasky, anything else from the government?

        MS. LASKY:  No, your Honor.

        THE COURT:  Ms. Waxman, anything else from the

defense?

        MS. WAXMAN:  Yes, your Honor, just one more request.

        It just occurred to me that if your Honor could also

recommend that Mr. Iloulian be sent to a facility where with he

can receive kosher food.

        THE COURT:  I assume that is available in any

institution in the United States.

        But yes, I will recommend to the Bureau of Prisons

that he be designated to an institution that will offer him

kosher food.

N4BsILOs

1                MS. WAXMAN:  Thank you.

2                THE COURT:  If there is nothing else, we're adjourned.

3                              *   *   *